# United States Court of Appeals
## For the First Circuit

No. 02-1382

DAVID DUDLEY,
Plaintiff, Appellee,

v.

HANNAFORD BROS. CO.,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Lipez, Circuit Judge.

Lawrence C. Winger for appellant.
John M.R. Paterson and Bernstein Shur Sawyer & Nelson on brief
for Maine Restaurant Ass'n, Maine Grocers Ass'n, Maine Oil Dealers
Ass'n, and Maine Merchants Ass'n, amici curiae.
Peter M. Rice, with whom Tracie L. Adamson, Lipman, Katz &
McKee, P.A., and Disability Rights Center of Maine were on brief,
for appellee.

June 24, 2003

**SELYA**, **Circuit Judge**.  Congress enacted the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (2000) (the ADA), with a view toward eliminating discrimination against persons with disabilities.  That is a laudable policy — but so is the policy of the State of Maine, variously expressed in statutes, regulations, and judicial decisions, that constrains retailers against the profligate sale of alcoholic beverages to inebriates.  This difficult case places those policies in tension with each other.

The underlying action arises out of a retailer's refusal to sell alcoholic beverages to a disabled person whose symptoms mimic the traits of intoxication.  The district court first concluded that Title III of the ADA permitted the maintenance of a private cause of action.  Dudley v. Hannaford Bros. Co., 146 F. Supp. 2d 82, 85-86 (D. Me. 2001) (Dudley I).  The court then found, following a non-jury trial, that the retailer, defendant-appellant Hannaford Bros. Co. (Hannaford), had sanctioned a policy that forbade the manager of the store in question from reconsidering a clerk's initial refusal to sell, even after the customer revealed his disability.  Dudley v. Hannaford Bros. Co., 190 F. Supp. 2d 69, 73 (D. Me. 2002) (Dudley II).  In the court's view, this hard-and-fast rule violated the ADA.  Id. at 76.

We agree with the district court that the ADA requires a retail establishment to exhibit more flexibility in serving disabled patrons.  Accordingly, we affirm the judgment below.

-2-

## I. BACKGROUND

We rehearse the facts as found by the district court, consistent with record support. See Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 180 (1st Cir. 1997).

In 1993, plaintiff-appellee David Dudley suffered massive trauma to his head, legs, and internal organs in an automobile accident. He never fully recovered from the effects of those injuries. Although he lost the manual dexterity needed to operate his appliance repair business, a regimen of therapy, stretching over several years, enabled him to resume a modicum of activities. His remaining symptomatology, however, included severely impaired speech, a pronounced loss of muscular control, an inability to take even breaths, and a tendency toward impulsive mood swings. The district court observed Dudley during the trial and described his speech as "awkward and often very difficult to comprehend." Dudley II, 190 F. Supp. 2d at 72. The court concluded that his gait and balance had been severely affected by his injuries and found his movements "exceedingly labored." Id. The court added that the use of an appliance, such as a cane or a walker, "would not significantly ameliorate his condition." Id.

On Saturday, February 27, 1999, Dudley moved from Augusta to a new abode in Gardiner, Maine. Although friends assisted him

in making the move, Dudley found the day tiring.[1]  That evening, he drove to a Shop 'n Save supermarket operated by Hannaford, intending to purchase alcoholic beverages.  He parked his van in a spot reserved for handicapped patrons, entered the store, and proceeded to the appropriate aisle.  He then began slowly to inspect the available merchandise.

The store's shift leader, Armand Cookson, noticed that Dudley was spending what seemed to be an inordinate amount of time staring at the shelves.  When Dudley finally selected a four-pack of wine coolers and proceeded toward the checkout counter, Cookson observed his rambling gait, drooping eyelids, and flushed face.  Cookson jumped to the conclusion that Dudley was intoxicated.  Accordingly, Cookson advised the cashier, Erin Donnell, not to sell Dudley any alcoholic beverages.

Dudley placed the wine coolers on the counter.  Donnell greeted him and received a slurred response.  Donnell, like Cookson, already had concluded that Dudley was drunk, and his slurred speech reinforced her mindset.  She told Dudley that she believed him to be intoxicated and, therefore, would not sell him any alcoholic beverages.  Dudley immediately became agitated, throwing his arms into the air and exclaiming, "Here we go again!"

---

[1]The testimony is uncontradicted that Dudley spent the entire day effectuating the move.  There is no evidence that he consumed any alcoholic beverages during that time span.

Speaking loudly, Dudley tried to explain that he was not besotted but disabled. Donnell was taken aback by Dudley's aggressive manner and stepped away from the cash register. Cookson then intervened, reiterating that the store would not sell any alcoholic beverages to Dudley and removing the wine coolers from the counter. Dudley became increasingly frustrated; in his labored speech, he tried to impart that injuries from a car wreck, not the overindulgent consumption of alcohol, explained his behavior. Cookson — who admitted at trial that he thought this explanation plausible when given — informed Dudley that the store had a strict rule prohibiting managers from reversing a cashier's decision not to sell alcoholic beverages to a customer. Dudley nonetheless persisted and asked to speak with the person in charge.

Henry Fossett, the night manager, responded. He had observed much of what had transpired. Dudley calmly described the nature of his disability. He pointed out that his car (clearly visible through the plate glass storefront) was parked in a handicapped parking place and bore license plates denoting that its owner was a person with a disability. He also encouraged Fossett to call the police so that he could take a breathalyzer test and prove conclusively that he was not intoxicated. After hearing Dudley's explanation, Fossett considered it possible that Dudley suffered from a disability. Nevertheless, Fossett fell back on the

store's policy, reiterating that management would not revisit a cashier's refusal to purvey alcoholic beverages to a customer.

Dudley left the store empty-handed. Since that evening, he has not attempted to purchase alcoholic beverages at the Gardiner Shop 'n Save or at any of Hannaford's other locations (despite Hannaford's relatively attractive prices). For its part, Hannaford has not changed any of its policies or practices regarding the sale of alcoholic beverages.

## II. TRAVEL OF THE CASE

On or about September 1, 1999, Dudley filed a charge of discrimination with the Maine Human Rights Commission (MHRC) under the ADA and the Maine Human Rights Act (MHRA). After the MHRC issued a right-to-sue letter, Dudley brought suit in the federal district court under Title III of the ADA, 42 U.S.C. §§ 12181-12189, and the counterpart provisions of Subchapter V of the MHRA, Me. Rev. Stat. Ann. tit. 5, §§ 4591 to 4594-F (West 2002). On July 10, 2001, the district court denied Hannaford's motion to dismiss, ruling that Dudley could pursue a private right of action under 42 U.S.C. § 12188(a)(1). See Dudley I, 146 F. Supp. 2d at 85-86. Following a two-day bench trial, the district court took the merits under advisement.

The court proceeded to write a thoughtful rescript delineating Dudley's incapacities, describing the events of February 27, 1999, and determining that Dudley was disabled within

-6-

the meaning of the ADA. Dudley II, 190 F. Supp. 2d at 71-74. The court found as a fact that "[a]t the Gardiner store it is an unwritten rule that once a cashier refuses to sell alcohol to a customer, the cashier's supervisors will rarely, if ever, reverse that decision." Id. at 73. Based in part on this finding, the court concluded that Hannaford's actions and policies violated Dudley's rights under the ADA. Id. at 76. Deeming the ADA and the MHRA coextensive, id. at 73, the district court further found that Hannaford's actions violated the MHRA, id. at 76.

The court then turned to the question of relief. Acting pursuant to both statutes, the court enjoined Hannaford from continuing to enforce its discriminatory "refusal to reconsider" policy at its Gardiner store. Id. Then, acting under the MHRA, the court imposed a $5,000 civil penalty and awarded Dudley reasonable attorneys' fees. Id. at 77. Hannaford now appeals.

**III. ANALYSIS**

We divide our analysis into several segments. We begin with an overview of the pertinent provisions of the ADA. We then discuss Hannaford's two principal defenses to the ADA claim. Finally, we turn to the MHRA claim.

### A. The ADA: An Overview.

The ADA did not emerge in a vacuum. Congress found that "society has tended to isolate and segregate individuals with disabilities," thus creating "a serious and pervasive social

problem." 42 U.S.C. § 12101(a)(2). Such individuals "continually encounter[ed] various forms of discrimination," id. § 12101(a)(5), and, as a group, "occup[ied] an inferior status in our society," id. § 12101(a)(6). Mindful of these inequities, Congress enacted the ADA "to address the major areas of discrimination faced day-to-day by people with disabilities," id. § 12101(b)(4), hoping "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals," id. § 12101(a)(8).

Title III of the ADA targets discrimination by privately operated places of public accommodation (including supermarkets and other types of retail shops). It sends a bluntly worded message to those establishments that fall within its purview: you may not discriminate against an individual in the full and equal access to goods and services on the basis of a disability.

The case before us involves Title III. The law's general prohibition stipulates that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

Id. § 12182(a). For purposes of section 12182(a), discrimination includes:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations . . . .

Id. § 12182(b)(2)(A)(ii).  The remedies contained in Title III are made available to:

> [A]ny person who is being subjected to discrimination on the basis of disability in violation of [Title III] . . . . Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

Id. § 12188(a)(1).

Dudley invokes these sections, claiming that Hannaford's policies precluded him, because of his disability, from full and equal access to the store's merchandise.

### B.  **The Existence of a Private Right of Action**.

Hannaford's initial response is that a single incident of discrimination is insufficient to support a private right of action under Title III of the ADA.  In mounting this argument, Hannaford does not challenge the district court's ruling that Dudley had standing to bring his Title III suit.  See Dudley I, 146 F. Supp.

2d at 85-86.[2]   Rather, Hannaford attacks the court's closely related determination, id. at 85, that the language of section 12188(a)(1) is broad enough to provide a private right of action for an individual who suffered a single incident of discrimination.

To the extent that this argument rests on the proposition that Title III is not intended to provide redress for past discrimination that is unlikely to recur, it is well-founded. Section 12188(a)(1) of the ADA incorporates the remedies set forth in 42 U.S.C. § 2000a-3(a). That compendium of remedies allows only injunctive relief (as opposed to money damages). See Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402 (1968) (per curiam). It therefore requires some ongoing harm (or, at least, a colorable threat of future harm). See 42 U.S.C. § 2000a-3(a) (permitting a civil action for injunctive relief whenever "there are reasonable grounds to believe that any person is about to engage in any [prohibited] act or practice") (emphasis supplied). Otherwise, an injunction would be pointless.

Dudley envisions the persistence of Hannaford's "refusal to reconsider" policy as an ongoing harm. But Dudley never attempted to purchase alcoholic beverages at the Gardiner Shop 'n

---

[2]In any event, this ruling enjoys substantial support. See, e.g., Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133, 1137-38 (9th Cir. 2002); Steger v. Franco, Inc., 228 F.3d 889, 892-94 (8th Cir. 2000); Parr v. L & L Drive-Inn Rest., 96 F. Supp. 2d 1065, 1077-81 (D. Haw. 2000); see generally Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (discussing the elements required to establish Article III standing).

Save either before or after the night in question, and Hannaford asserts that Dudley, in order to establish an ongoing harm, must prove that a subsequent effort on his part to purchase alcoholic beverages at the Gardiner store would have been "a futile gesture." Id. § 12188(a)(1). Without this embellishment, Hannaford says, Dudley is not being subjected to discrimination on a current basis, as Title III requires.

The proposition that Hannaford advances — that a disabled person must subject himself to repeated instances of discrimination in order to invoke the remedial framework of Title III of the ADA — turns the language of section 12188(a)(1) on its head. The futile gesture provision is designed to protect a disabled plaintiff from having to shoulder an undue evidentiary burden. Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133, 1136 (9th Cir. 2002). Yet Hannaford's rendition of the provision converts it into one that creates just such a burden. We do not believe that establishing a private right of action under Title III requires a plaintiff to perform such heroic measures.

Under Title III of the ADA, courts typically have gauged the discriminatory effect of a policy or practice by the degree to which that policy or practice denies access to a disabled individual, not merely by the specific instances in which the policy or practice frustrates the individual. See, e.g., id. at 1136-37 (holding that a disabled individual suffers an injury once

he has "become aware of discriminatory conditions existing at a public accommodation . . . and is thereby deterred from visiting or patronizing that accommodation"); Steger v. Franco, Inc., 228 F.3d 889, 893 (8th Cir. 2000) (holding that a disabled individual may invoke Title III to demand that a building be brought into compliance with the ADA even though he only entered the building once). In these cases, the existence of a private right of action under section 12188(a)(1) does not depend upon how many attempts a plaintiff has made to overcome a discriminatory barrier, but, rather, upon whether the barrier remains in place.

Our analysis, however, cannot stop there. This is not a "physical barrier" case and, as Hannaford correctly observes, the likelihood that Dudley would be denied a future right to purchase necessarily turns on an informed prophecy about a store clerk's subjective judgment. Moreover, Hannaford suggests that the evening in question may have been atypical both because it was a Saturday night and because it followed a grueling move that may have exacerbated Dudley's symptoms. Were Dudley to come into the Gardiner store at a more tranquil time or after a less harrowing day, this thesis runs, he might not encounter the same difficulties.

This idiosyncratic fact pattern distinguishes the case at hand from the mine-run of Title III cases (like the prototypical "physical barrier" cases). To the extent that those other cases

-12-

enter into a discussion of probabilities, that discussion usually occurs in the context of determining whether a particular plaintiff enjoys standing to launch a Title III claim. Consequently, the court scrutinizes the likelihood that a plaintiff, absent the barrier, would have frequented the public accommodation in the future. See, e.g., Pickern, 293 F.3d at 1138; Schroedel v. NYU Med. Ctr., 885 F. Supp. 594, 598-99 (S.D.N.Y. 1995). Although those cases do not involve a direct inquiry as to whether the practice that blocked access once would do so again, they nonetheless articulate a standard that can be tailored to fit the unusual dimensions of the instant case.

As a general matter, recent Title III cases have required plaintiffs to show a real and immediate threat that a particular (illegal) barrier will cause future harm. See, e.g., Steger, 228 F.3d at 892; Deck v. Am. Haw. Cruises, Inc., 121 F. Supp. 2d 1292, 1299 (D. Haw. 2000); Hoepfl v. Barlow, 906 F. Supp. 317, 321 (E.D. Va. 1995); Schroedel, 885 F. Supp. at 599; Aikins v. St. Helena Hosp., 843 F. Supp. 1329, 1333 (N.D. Cal. 1994). This standard has been adapted from generic Supreme Court precedents discussing whether a plaintiff has standing to protest a particular injury. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (holding that "the irreducible constitutional minimum of standing" includes suffering an "injury in fact" that is "actual or imminent") (citations omitted); City of Los Angeles v. Lyons, 461

-13-

U.S. 95, 105 (1983) (requiring a plaintiff requesting injunctive relief to "establish a real and immediate threat" that illegal conduct will occur); O'Shea v. Littleton, 414 U.S. 488, 494 (1974) ("Abstract injury is not enough. . . . The injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (citations omitted). Even though no court has yet employed this standard to determine whether a plaintiff has a private right of action under section 12188(a)(1), we deem it an appropriate way to answer that inquiry.

Applying that standard, we conclude that Dudley has shown a real and immediate threat of ongoing harm. After all, the offending policy remains firmly in place; there is no dispute that Dudley, having just moved to a small town, would have been likely to patronize the Gardiner Shop 'n Save; and the symptoms of his disability continue to mimic the side effects of intoxication. Moreover, three Hannaford employees (Donnell, Cookson, and Fossett) all independently concluded that Dudley was inebriated. These facts suggest that Hannaford is overstating the degree of randomness involved in a store clerk's perceptions. Notably, even Hannaford does not venture to predict a different result if the contributing circumstances of February 27 — when a weary Dudley entered the store on a Saturday night — were to recur.

We hasten to add that Dudley's experience on that evening was not wholly unique. The record shows three other incidents that

are informative (even though none of them involved a Hannaford store). The first two occurred prior to February 27, 1999. In each instance, a sales clerk mistook Dudley's disability for intoxication and, before receiving an explanation, refused to sell him alcohol. On the third occasion (after the events of February 27, 1999), a sales clerk again rebuffed Dudley in an attempt to purchase alcoholic beverages. On all three occasions, Dudley explained the situation and the store relented. If these establishments adhered to a strict "refusal to reconsider" policy, similar to Hannaford's, Dudley's efforts to purchase liquor would have been thwarted. Thus, while there is no absolute certainty that Dudley would be denied the right to purchase alcoholic beverages during a future visit to the Gardiner Shop 'n Save, the likelihood of a denial seems substantial. No more is exigible to support a Title III right of action.

This conclusion rests, in part, on the background understanding that section 12188(a)(1) negates any requirement that a disabled person engage in a futile gesture to establish the existence of a discriminatory policy or practice. See Pickern, 293 F.3d at 1136-37 (explaining that when a disabled plaintiff has actual knowledge of an illegal barrier at a public accommodation and is thereby deterred, he need not engage in the futile gesture of attempting to gain access to show ongoing harm); Steger, 228 F.3d at 892 (similar). We have scant case law to guide us on how

futile a gesture must be to satisfy this benchmark,[3] but Congress clearly meant not to overburden Title III claimants.  This is evident from the fact that Title III's remedies mirror those contained in Title II of the Civil Rights Act of 1964.  In enacting the latter statute, Congress evinced its understanding "that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance."  Newman, 390 U.S. at 401.  It is fair to assume that Congress had the same understanding when it enacted Title III of the ADA.  See generally H.R. Rep 101-485(II), at 126 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 409 (noting Congress's explicit intention "to make [section 12188(a)(1)] consistent with title II of the Civil Rights Act of 1964").  Limiting Title III relief to instances in which a future violation appears certain to occur would create a standard far more demanding than that contemplated by the congressional objectives that influenced the ADA.

To sum up, the question before us is whether Dudley has proffered enough evidence to establish a real and immediate threat

---

[3]This court has not addressed the meaning of "futile gesture" as that phrase is used in 42 U.S.C. § 12188(a)(1).  We have, however, spoken to the meaning of the words "futile gesture" in other contexts.  For example, in Portela-Gonzalez v. Sec'y of the Navy, 109 F.3d 74 (1st Cir. 1997), discussing the proposition that the prospect of a futile gesture may serve to relax an administrative exhaustion requirement, we ruled that "futility . . . must be anchored in demonstrable reality.  A pessimistic prediction or a hunch that further administrative proceedings will prove unproductive is not enough to sidetrack the exhaustion rule." Id. at 78.

that Hannaford's policy will again result in a Title III violation. Given the remedial purpose underlying the ADA, courts should resolve doubts about such questions in favor of disabled individuals. See Arnold v. United Parcel Serv., Inc., 136 F.3d 854, 861 (1st Cir. 1998); see also Tcherepnin v. Knight, 389 U.S. 332, 336 (1967) (recognizing the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes"). So viewed, we think that the record shows a sufficient probability of a repeat occurrence, and, in any event, Hannaford points to nothing suggesting that Dudley would be treated differently if the circumstances of February 27 were replicated today. Although the issue is close, we therefore hold that section 12188 provides Dudley with a private right of action.

### C. **The Merits of Dudley's ADA Claim**.

To recover under section 12182(b)(2)(A)(ii) in a retail sale case, a plaintiff must show that he comes within the protections of the ADA as a person with a disability, 42 U.S.C. § 12102(2), and that the defendant's establishment is subject to the mandates of Title III as a place of public accommodation, id. § 12181(7). Above and beyond these two abecedarian points, the plaintiff must show that the defendant has a discriminatory policy or practice in effect; that he (the plaintiff) requested a reasonable modification in that policy or practice which, if granted, would have afforded him access to the desired goods; that

the requested modification — or a modification like it — was necessary to afford that access; and that the defendant nonetheless refused to modify the policy or practice. PGA Tour, Inc. v. Martin, 532 U.S. 661, 683 n.38 (2001); Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999); Johnson v. Gambrinus Co./Spoetzl Brewery, 116 F.3d 1052, 1058-60 (5th Cir. 1997). Upon such a six-part showing, the defendant must make the modification unless it proves either that doing so would alter the fundamental nature of its business, see PGA Tour, 532 U.S. at 683 & n.38, or that the requested modification poses a direct threat to the health or safety of others, Bragdon v. Abbott, 524 U.S. 624, 648-49 (1998).

In the lower court, Hannaford contested Dudley's claim that he had a disability within the meaning of 42 U.S.C. § 12102(2)(A). The district court resolved this point in Dudley's favor. Dudley II, 190 F. Supp. 2d at 74. Because Hannaford does not renew this challenge on appeal, we deem the argument waived. See United States v. Slade, 980 F.2d 27, 30 n.3 (1st Cir. 1992); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Consequently, Dudley meets the first prong of the test. Dudley also meets the second, as Hannaford concedes that its Gardiner store is a place of public accommodation within the purview of Title III.

As to the other elements, it is incontrovertible that Hannaford had a hard-and-fast "refusal to reconsider" policy in

-18-

place, that Dudley requested Hannaford to deviate from that policy, that such a deviation was necessary for Dudley to gain access to the desired goods, and that his request was denied. What remains are questions concerning the reasonableness of the requested modification. As to those questions, Hannaford makes four main points. Its primary argument is that the district court erred in interpreting section 12182(b)(2)(A)(ii) to prohibit the unbending implementation of its "refusal to reconsider" policy. The argument takes two forms. We consider each of them.

First, Hannaford posits that section 12182(b)(2)(A)(ii) only applies to individuals with known or obvious disabilities. It says that since Dudley's condition was not of this nature — his symptoms were ambiguous, and Hannaford's personnel were uncertain as to whether his behavior stemmed from a disability or from substance abuse — its adherence to the store's policy did not violate section 12182(b)(2)(A)(ii).

Hannaford derives this argument from 42 U.S.C. § 12112(b)(5)(A), which prohibits employers from failing to "mak[e] reasonable accommodations to the <u>known</u> physical or mental limitations of an otherwise qualified individual with a disability." (Emphasis supplied.) Its reliance on that provision is mislaid. Section 12112(b)(5)(A) is a part of Title I of the ADA — and there is no principled basis for importing it into Title III.

While Title III imposes certain requirements on operators of public accommodations vis-à-vis their interactions with the citizenry at large, Title I places obligations on employers regarding their relations with employees and prospective employees. This distinction is significant. In an employment context, where relationships are personalized and employers typically have a basic familiarity with their employees, section 12112(b)(5)(A)'s limited applicability to "known physical or mental" disabilities makes sense; it takes into account the possibility that an employee or prospective employee may, for whatever reason, choose not to disclose a disability. He may, for example, fear that if he discloses it, he will be disadvantaged (the employer will, say, refrain from promoting or hiring him). When such a disability is concealed, it would be mindless to hold the employer liable for failing to accommodate the (unknown) disability. So viewed, under Title I obviousness is relevant only as a proxy for actual knowledge. See Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 934 (7th Cir. 1995) (explaining that the obviousness of symptomatology makes it "reasonable to infer that an employer actually knew of the disability").

In contrast, Title III offers no incentive for an individual to conceal his or her disability. The operative provision, 42 U.S.C. § 12182(b)(2)(A)(ii), requires a person with a disability to request a reasonable and necessary modification,

thereby informing the operator of a public accommodation about the disability. It would be pointless to impose upon the plaintiff the burden to inform the public accommodation's operator of his disability but then exempt the operator, by judicial fiat, from accommodating disabilities that are not obvious. Congress did not place a limitation on the reach of Title III based on the obviousness of an individual's disability, and it would be a usurpation of congressional authority for us to do so here. See Bates v. United States, 522 U.S. 23, 29-30 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations and internal quotation marks omitted); 229 Main St. Ltd. P'ship v. Mass. Dep't of Envtl. Prot. (In re 229 Main St. Ltd. P'ship), 262 F.3d 1, 5-6 (1st Cir. 2001) (similar). For these reasons, we hold that the obviousness vel non of an individual's disability has no relevance to the mandates of Title III.

Hannaford's next objection posits that Dudley's request was not reasonable (and, thus, not within the protections of 42 U.S.C. § 12182(b)(2)(A)(ii)). Hannaford claims, variously, that the requested modification is unworkable and that its implementation would fundamentally alter the nature of its business. Joined by the amici, Hannaford envisions a parade of

horribles. It tells us that prohibiting merchants from following a strict "refusal to reconsider" policy would force retailers to sell alcoholic beverages to inebriated individuals who claim to be disabled, thus jeopardizing their licensure and exposing them to both civil and criminal liability under Maine law. See, e.g., Me. Rev. Stat. Ann. tit. 28-A, §§ 705(2-A), 705(3-A), 801(2), 2506. Hannaford and the amici also note that drunk driving is a salient public health concern and worry that the district court's ruling may increase the incidence of such behavior.

These are valid concerns, and the ADA requires us to weigh them when determining what is reasonable under section 12182(b)(2)(A)(ii). See 42 U.S.C. § 12182(b)(3) ("Nothing in [Title III] shall require an entity to permit an individual to participate in or benefit from the goods . . . of such an entity where such individual poses a direct threat to the health or safety of others."). That is not unfamiliar ground: striking a reasonable balance between avoiding health and safety risks, on the one hand, and protecting persons with disabilities from discrimination, on the other hand, is an exercise that lies at the core of Title III determinations. See Sch. Bd. of Nassau County v. Arline, 480 U.S. 273, 287-88 (1987); Theriault v. Flynn, 162 F.3d 46, 48-49 (1st Cir. 1998). Here, our inquiry must address whether Hannaford's unbending "refusal to reconsider" policy is sufficiently essential to its stated goals to justify its

-22-

discriminatory effect. We conclude that the policy, as applied, is overinclusive, and that a more flexible policy can offer comparable protections while complying with both the letter and spirit of the ADA.

We start this phase of our analysis with a frank appraisal of the doomsday alarms sounded by Hannaford and the amici: those concerns are overstated. Neither the ADA nor the district court's ruling guarantees individuals with disabilities access to alcoholic beverages; thus, the fear that a claim of disability will become a free pass for intoxicated individuals to purchase liquor is not well-founded.

Under the district court's holding, a merchant needs to initiate a reconsideration only when a customer claiming to be disabled presents some evidence of that disability. Even then, the obligation to reconsider is not to be confused with an obligation to sell; the reconsideration may well produce a second refusal without in any way violating the ADA. Put bluntly, the district court's ruling does not obligate a merchant to sell when in doubt. For that reason, Hannaford's (and the amici's) prediction that the ruling will promote a host of social ills seems farfetched. Cf. W. Shakespeare, Macbeth, act I, sc. 3, l. 134 (1606) (warning that "[p]resent fears are less than horrible imaginings").

To be sure, the district court's ruling involves other costs. The law should leave ample room for Hannaford and other

-23-

similarly situated merchants to adopt prophylactic policies to ensure that intoxicated individuals will not be able freely to purchase alcoholic beverages. To this end, a bright-line rule, such as Hannaford's "refusal to reconsider" policy, offers certain administrative efficiencies. Moreover, it forecloses potentially uncomfortable conversations with combative customers and spares store managers from making difficult decisions. But even though an individualized inquiry will consume more resources and involve less logistical ease, such an inquiry is precisely what the ADA requires. See PGA Tour, 532 U.S. at 690 (noting that the ADA has a "basic requirement that the need of a disabled person be evaluated on an individual basis"); Theriault, 162 F.3d at 50 (approving the tailoring of special policies for disabled individuals as long as there is an "individualized assessment" of each person's disabilities); see also 28 C.F.R. § 36.208(c). This makes perfect sense, as Congress, in enacting the ADA, explicitly warned that "overprotective rules and policies" erect discriminatory barriers to people with disabilities. 42 U.S.C. § 12101(a)(5). Consequently, when an individual claims to be disabled and presents some evidence supporting that claim, the proprietor of a place of public accommodation does not satisfy its obligations under Title III of the ADA by refusing to consider that proffer and responding that the clerk already has made her

decision. We hold, therefore, that the ADA bars Hannaford's unrelenting "refusal to reconsider" policy.

Hannaford's next contention can be dispatched more easily. It says that, notwithstanding the district court's factual finding of an established, albeit unwritten, "refusal to reconsider" policy, the personnel at its Gardiner store did not follow that policy on the evening in question, but, rather, listened to Dudley's plaint, gave it due consideration, and only then denied him the right to purchase alcoholic beverages.

If we were writing on a pristine page, this interpretation of the events of February 27 might seem plausible — but the page is not pristine. The district court found as a fact that Cookson rejected Dudley's attempted purchase by informing him that "once [the clerk] had refused to sell him alcohol, the store policy was not to reverse that decision under any circumstances." Dudley II, 190 F. Supp. 2d at 72. The court characterized Fossett's intervention in similar terms, noting that Fossett "explained to Dudley that he would not reverse" the earlier position. Id. This meant, the court wrote, that Fossett would override a cashier's decision only when "a customer had alerted him to an intoxication-mimicking disability before attempting to purchase alcohol." Id. at 73 (emphasis in the original).

That ends this aspect of the matter. When a district court chooses between two plausible but conflicting interpretations

of the evidence, its choice cannot be clearly erroneous.[4] <u>Valentin</u> v. <u>Hosp. Bella Vista</u>, 254 F.3d 358, 367 (1st Cir. 2001); <u>United States</u> v. <u>Ruiz</u>, 905 F.2d 499, 508 (1st Cir. 1990).

These factual findings also guide us through Hannaford's remaining two arguments. Its claim that "Dudley failed to prove that Hannaford's breach of its duty of reconsideration proximately caused any harm to Dudley," Appellant's Br. at 39, rests on the surmise that if Hannaford's employees had given Dudley due reconsideration, they nonetheless would have thought him three sheets to the wind and refused the sale. This is an interesting but irrelevant hypothetical. Our focus is on the exclusionary effect of Hannaford's policy — its unrelenting refusal to reconsider, come what may — and the only issue before us is whether a reasonable modification was necessary to afford disabled persons (like Dudley) access to goods that are available to individuals without disabilities. <u>See</u> 42 U.S.C. § 12182(b)(2)(A)(ii). Dudley does not need to prove that a particular modification would have worked in all cases but only that such a modification was a necessary and reasonable means of providing disabled persons access to the goods in question. The district court found that he had

_____

[4]Hannaford makes much of Fossett's subsequent conversation with Dudley, claiming that Fossett at that time independently evaluated Dudley's cognitive state and used that evaluation to ground his refusal to reconsider. This argument overlooks the district court's supportable finding that this later interaction was not causally connected either to the denial of the sale or to the refusal to reconsider. <u>Dudley II</u>, 190 F. Supp. 2d at 72-73.

carried that burden.  Dudley II, 190 F. Supp. 2d at 76.  That finding is not clearly erroneous.  Carr v. PMS Fishing Corp., 191 F.3d 1, 6 (1st Cir. 1999); Sierra Fria, 127 F.3d at 181.

Finally, Hannaford suggests that if it had a general duty to reconsider, that duty was superseded by Dudley's aggressive behavior.  Passing over the fact that Dudley's behavior probably is part and parcel of the symptomatology related to his disabling condition, the fallacy of this suggestion lies in its construction. In this situation, the ADA proscribes mechanical resort to an inflexible "refusal to reconsider" policy.  Dudley's behavior subsequent to the store's decision not to sell is simply irrelevant to a determination of whether the "refusal to reconsider" policy is consistent with the ADA.[5]

We have said enough on this score.  All equitable remedies are, in some sense, discretionary.  Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 321 & n.6 (1st Cir. 1989) (en banc). The modest relief granted here — prohibiting Hannaford from maintaining its "refusal to reconsider" policy at its Gardiner emporium — was not an abuse of discretion.  Given the court's factual findings, Dudley was entitled to injunctive relief under Title III of the ADA.

---

[5]We do not gainsay that, had Hannaford's employees given Dudley fair reconsideration, his behavior would be relevant (although not necessarily conclusive) in making a judgment as to whether he was intoxicated.  Here, however, the lower court's factual findings foreclose that analytic path.

#### D. **The MHRA Claim**.

Hannaford also challenges the district court's ruling that Hannaford's "refusal to reconsider" policy violated the MHRA. Dudley II, 190 F. Supp. 2d at 77. This challenge lacks force.

It is settled law that the MHRA should be construed and applied along the same contours as the ADA. See, e.g, Abbott v. Bragdon, 107 F.3d 934, 937 n.1 (1st Cir. 1997); Soileau v. Guilford of Me., Inc., 105 F.3d 12, 14 (1st Cir. 1997); Winston v. Me. Tech'l Coll. Sys., 631 A.2d 70, 74 (Me. 1993). Thus, our determination that Hannaford's policy violates the ADA, see supra Part III(C), means that the policy also violates the MHRA.

There are, however, differences between the two statutory schemes, and two such differences are material here. Unlike Title III of the ADA, the enforcement provisions of the MHRA allow the court both to assess monetary penalties (up to $10,000 against a first-time offender) and to award reasonable attorneys' fees to a prevailing plaintiff. See Me. Rev. Stat. Ann. tit. 5, §§ 4613(2)(B)(7), 4614.

Here, however, the MHRA complaint was filed out of time.[6] In the circumstances of this case, that fact does not place the

---

[6]The record reflects some disagreement as to when Dudley submitted his complaint to the MHRC. Under either party's scenario, however, the complaint was not timely. See Me. Rev. Stat. Ann. tit. 5, § 4611. That being so, the district court concluded that the disagreement as to the precise filing date did not need to be resolved. See Dudley II, 190 F. Supp. 2d at 76. On appeal, neither side questions that conclusion.

full panoply of statutory remedies out of reach. While an untimely complaint before the MHRC normally would preclude any award of civil penalties or attorneys' fees, the MHRA allows those remedies to be granted if an untimely MHRA claim is joined with a claim that does not require administrative exhaustion. See id. § 4622(1). Since Dudley's ADA claim is of that genre, the exception limned in section 4622(1) applies here. See Dudley II, 190 F. Supp. 2d at 77. Hence, we affirm the imposition of the civil penalty and the order for payment of reasonable attorneys' fees.

## IV. CONCLUSION

The ADA protects disabled individuals against policies that categorically deny them access to goods that are available to the general population. Even though Hannaford's offending policy excludes only a tiny number of disabled individuals, the ADA demands that the interests of those individuals be protected.

Thus, we affirm the district court's binary conclusion that Dudley's single visit to the Gardiner store is sufficient, in the circumstances of this case, to state a claim under 42 U.S.C. § 12188(a)(1); and that the store's rigid "refusal to reconsider" policy offends Title III of the ADA. Our holding on the second prong is narrow: we rule only that the ADA proscribes the use by a place of public accommodation of an inflexible policy that forecloses any attempt by an individual with an intoxication-mimicking disability to show that a clerk has mistaken his

-29-

disability for drunkenness (and, thus, mistakenly refused him access to alcoholic beverages).

At the expense of belaboring what should be obvious, we emphasize that although we strike down Hannaford's "refusal to reconsider" policy, we do so believing that the ADA leaves significant room for merchants to devise alternative, ADA-compliant strategies to ensure the safe sale of alcoholic beverages. Nothing in our holding prevents merchants from exercising caution in determining whether an individual is sufficiently sober to purchase alcoholic beverages. By the same token, nothing in our holding guarantees any individual — disabled or not — alcohol on demand.

We need go no further. For the foregoing reasons, we affirm the lower court's determination that Hannaford's hard-and-fast "refusal to reconsider" policy is in violation of both the ADA and the MHRA. Consequently, we uphold the injunction, the civil penalty, and the award of counsel fees.

**Affirmed**.