# United States Court of Appeals
## For the First Circuit

No. 25-1578

ED FRIEDMAN,

Plaintiff, Appellant,

v.

CENTRAL MAINE POWER COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John C. Nivison, U.S. Magistrate Judge]

Before

Barron, Chief Judge,
Howard and Rikelman, Circuit Judges.

William Most, with whom David Lanser and Most & Associates
were on brief, for appellant.
Christopher C. Taintor, with whom Russell B. Pierce, Jr., and
Norman, Hanson & DeTroy, LLC were on brief, for appellee.

April 29, 2026

**RIKELMAN, <u>Circuit Judge</u>.** Central Maine Power Company (CMP) uses digital "smart meters" to track its customers' electricity usage. Ed Friedman, a former CMP customer who suffers from a rare and incurable form of blood cancer, seeks to keep his analog meter, claiming that radiation emitted from smart meters poses risks to his health. After CMP declined to waive the fee for retaining an analog meter, Friedman sued CMP for disability discrimination.

The district court granted summary judgment to CMP, concluding that Friedman had failed to marshal enough evidence to go to trial on a critical issue: the alleged causal connection between radiofrequency radiation from smart meters and Friedman's cancer symptoms. We agree with the district court's ruling and thus affirm.

## I. BACKGROUND

### A. Relevant Facts[1]

Friedman, a resident of Bowdoinham, Maine, suffers from lymphoplasmacytic lymphoma, a rare form of blood cancer. Because there is no cure, his treatment has focused on palliative care to mitigate the effects of his disease.

---

[1] "In reviewing the district court's decision granting summary judgment to [CMP], we recite the facts in the record in the light most favorable to [Friedman] and draw all reasonable inferences from those facts in [his] favor." <u>Cruz-Cedeño</u> v. <u>Vega-Moral</u>, 150 F.4th 1, 3 (1st Cir. 2025).

For many years, Friedman was a customer of CMP, which provides electricity service to Maine residents. CMP measures residential electricity usage through meters typically placed on the outside of its customers' homes.

In 2010, CMP received approval from the Maine Public Utilities Commission (MPUC) to implement Advanced Metering Infrastructure (AMI). AMI permits automated and remote meter reading, tracks and stores customer-usage data, and allows communications to and from customers' meters. AMI devices, including the new digital smart meters, transmit data via radiofrequency (RF) signals.

Shortly after approving the AMI proposal, MPUC received an initial complaint alleging that RF radiation emitted from AMI meters could potentially cause cancer. In response, MPUC directed CMP to allow customers to opt out of AMI but instructed it to charge such customers the incremental costs of the alternative metering. In the order it issued in 2011, MPUC expressly stated that it was not addressing the merits of the health concerns raised in the complaint.

Based on MPUC's order, CMP permitted customers to opt out of the AMI program by using either their existing analog meters -- which do not emit any RF radiation -- or the new smart meters in a non-transmitting mode. CMP also instituted an opt-out fee: As of 2023, a customer who elected to keep their analog meter

- 3 -

would have to pay an upfront charge of $40, plus a recurring monthly fee of approximately $18.[2]

In 2011, two years before his 2013 cancer diagnosis, Friedman and 18 other CMP customers filed their own complaint with MPUC, alleging that AMI was unsafe. In December 2014, after conducting a lengthy investigation, MPUC issued a final order concluding that AMI meters "do[] not present a credible threat of harm to the health and safety of CMP's customers" and are "therefore[] safe."

In 2016, several years after his cancer diagnosis, Friedman decided to seek a waiver of the opt-out fee based on his concern that RF radiation from a smart meter would worsen his lymphoma and symptoms.[3] To support his waiver request, he asked his oncologist/hematologist, Dr. David Benton, to sign a letter that Friedman had drafted. Dr. Benton, however, "wasn't comfortable" endorsing certain aspects of the letter. For example, the initial draft stated that RF radiation "exacerbates problems already experienced" by Friedman. But Dr. Benton was not aware of any studies suggesting that RF radiation could exacerbate

---

[2] Similarly, a customer who elected to use the smart meter in non-transmitting mode would have to pay an upfront charge of $20 and a recurring monthly fee of approximately $16.

[3] Before his cancer diagnosis in 2013, Friedman had already opted out of the AMI program in favor of keeping an analog meter on his home. He decided against smart-meter installation for both health and privacy reasons.

Friedman's symptoms. Nor had he formed an opinion about whether RF radiation could cause any harmful physical-health effects. Thus, he "soften[ed]" the language to explain, among other things, that RF radiation "may exacerbate" Friedman's cancer symptoms. (Emphasis added.) Dr. Benton testified that he ultimately agreed to sign the letter because the smart-meter issue had "cause[d] [Friedman] stress" and he "hop[ed] that [Friedman] could live his life with cancer without that stress."

Friedman submitted a formal request that CMP waive the AMI opt-out fee and attached Dr. Benton's letter, but CMP declined his request. Friedman proceeded to withhold payment of the opt-out fee for several months, eventually leading CMP to disconnect his electricity service.

## B. Procedural History

In July 2020, Friedman sued CMP in the U.S. District Court for the District of Maine. He claimed that CMP had discriminated against him on the basis of his disability by failing to provide a reasonable accommodation, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12132, 12182; the Rehabilitation Act, 29 U.S.C. § 794; and the Fair Housing Act (FHA), 42 U.S.C. § 3604. He also alleged that the opt-out fee constituted an illegal "surcharge" under the ADA's implementing regulations. See 28 C.F.R. § 36.301(c). Friedman sought damages

- 5 -

and declaratory and injunctive relief, including waiver of the opt-out fee to keep his analog meter.

CMP moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).[4] The district court denied the motion, concluding that Friedman's allegation that smart meters "may exacerbate" the progression of his lymphoma plausibly stated a discrimination claim. The court noted, however, that to prevail on the merits, Friedman would have to "prove . . . that having a smart meter installed at his home actually risks worsening his lymphoma's progression or symptoms."

The parties proceeded to discovery and retained dueling experts. For his part, Friedman timely designated two experts to opine on the health effects of RF radiation: Dr. Paul Héroux, who holds a Ph.D. in physics and is an expert in electromagnetic radiation; and Dr. David Carpenter, who holds a medical degree and specializes in public health, specifically the health effects of electromagnetic fields.[5]

Friedman's experts both offered opinions on the potential dangers of RF radiation. In his report, Dr. Héroux

---

[4] In 2021, CMP petitioned MPUC for permission to waive Friedman's opt-out fee. Friedman opposed CMP's petition in part because he was concerned that the waiver may not be permanent if CMP were to be acquired by another company.

[5] Friedman initially designated three expert witnesses but voluntarily withdrew one of them after CMP moved to exclude that expert's testimony at trial.

explained that "increases in the levels of electromagnetic radiation in the environment" can "irreversibly affect[]" human cells. On that basis, Dr. Héroux opined that "[h]aving a smart meter installed at . . . Friedman's home carries a risk of worsening his lymphoma's progression or symptoms." Similarly, Dr. Carpenter opined that a smart meter installed on Friedman's home "would increase the risk his cancer could worsen which in turn logically may exacerbate his symptoms." To support his opinion, Dr. Carpenter relied on studies connecting RF exposure to deoxyribonucleic acid (DNA) damage, which he described as a common "precursor to cancers." Dr. Carpenter acknowledged the lack of evidence connecting Friedman's cancer to RF exposure but cited a study demonstrating that elevated exposure to electromagnetic fields was associated with shortened survival among children diagnosed with leukemia, also a blood cancer.

After deposing Drs. Héroux and Carpenter, CMP moved to exclude their testimony under <u>Daubert</u> v. <u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). CMP argued that the experts had no knowledge of the details of Friedman's medical condition or his potential RF exposure from CMP's smart meters and thus could not offer opinions on the impact of smart-meter technology on Friedman's health.

The district court granted the motion in part, limiting the scope of the experts' planned testimony. The court determined

that the experts could offer opinions about general causation -- that is, whether RF exposure could cause some harm to some people with cancer. But the court precluded the experts from opining on specific causation -- that is, "applying [their] observations on general causation to Friedman's particular circumstances" -- given their lack of "any special knowledge specific to Friedman's prognosis or symptoms." Thus, the court prohibited the experts from offering opinions on the central issue in the case: whether CMP's smart meters risked exacerbating Friedman's medical condition in particular. Friedman does not appeal that ruling.

CMP then moved for summary judgment. It argued that (1) Friedman lacked standing to sue; (2) the fee for keeping an analog meter did not constitute a discriminatory surcharge; (3) MPUC's 2014 ruling on AMI collaterally estopped Friedman from bringing his discrimination claims; and (4) the limitations on the expert-witness testimony left the record devoid of evidence connecting smart-meter RF exposure to any deterioration in Friedman's physical condition.

In opposing CMP's summary judgment motion, Friedman cited the opinions of his treating providers -- Dr. Benton, his oncologist, and Dr. Stephen Goldbas, his primary-care physician. According to Friedman, they could bridge the specific-causation gap by opining on the harmful effect of RF radiation on his cancer

and treatment, thus creating a triable issue on causation. CMP, however, opposed any reliance on the treating physicians' opinions because Friedman had not designated them as expert witnesses during discovery.

The district court granted CMP's motion for summary judgment.[6] The court began by consolidating its analysis of standing and the merits because the issue of causation was central to both inquiries. It then turned to evaluating Friedman's claims. First, the court concluded that the general-causation testimony alone was insufficient to demonstrate that a waiver of the opt-out fee was "necessary" within the meaning of the federal antidiscrimination laws. Second, it excluded the proffered opinions of Friedman's treating physicians because they were disclosed too late. And the court concluded that even with the treating physicians' testimony, the record was insufficient to create a triable issue on whether radiation from the smart meter would cause a detrimental effect on Friedman's health. Finally, the court held that the opt-out fee was "not an unlawful surcharge" under the ADA.

Friedman timely appealed.

---

[6] In April 2024, the parties consented to proceed before a magistrate judge for the remainder of the litigation, so we refer to the magistrate judge as the "district court."

## II. DISCUSSION

Friedman raises three challenges to the district court's summary judgment ruling in CMP's favor. First, he contends that the court applied the incorrect causation standard to his discrimination claims by requiring that he prove with "certainty" that the smart meter would exacerbate his cancer symptoms. Second, he maintains that the court erred in excluding the opinions of his treating physicians, Drs. Benton and Goldbas. And finally, he asserts that the court erroneously held that the opt-out fee does not constitute an unlawful surcharge. We conclude that none of these challenges provide a basis for reversing the district court.

### A. Standing

Before turning to Friedman's merits arguments, we address CMP's threshold position that we can affirm the district court's ruling on the ground that Friedman lacks standing to pursue his claims. According to CMP, any risk of harm from its smart meter to Friedman's health is "too attenuated [and] too speculative" to satisfy constitutional standing requirements.

Article III of the Constitution grants federal courts the authority to decide only those legal disputes that qualify as "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To establish Article III standing, a party must meet a familiar three-part test and show that it has "suffered an injury in fact" that is caused by the "conduct complained of" and that will be

- 10 -

"redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). The asserted injury must be "concrete, particularized, and actual or imminent." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). At the summary judgment stage, a plaintiff like Friedman must "set forth by affidavit or other [admissible] evidence specific facts" to support standing, just as he must do to establish a triable claim on the merits. Lujan, 504 U.S. at 561 (internal quotation marks omitted) (quoting Fed. R. Civ. P. 56(e)); see Jones v. L.A. Cent. Plaza LLC, 74 F.4th 1053, 1058 (9th Cir. 2023).

Typically, we analyze questions of standing and the merits separately, because a federal court cannot evaluate the merits unless there is an Article III controversy between the parties that it has the power to decide. See In re Evenflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig., 54 F.4th 28, 34-35 (1st Cir. 2022). Here, however, CMP contends that Friedman should lose on both standing and the merits because he did not put forward the type of evidence required at the summary judgment stage to create a dispute about whether smart meters pose a non-speculative risk to his health. See 13A Wright & Miller's Federal Practice & Procedure § 3531 n.6 (3d ed. 2025) (recognizing that "[t]he separation of injury from the merits can become indistinct when considering merely potential, not realized injury").

In attacking both Friedman's standing to sue and the merits of his claims, CMP argues that Friedman has failed to demonstrate an injury in fact, especially if the testimony of his treating physicians is excluded. According to CMP, because the summary judgment record lacks admissible, non-speculative evidence demonstrating that its smart meter will harm Friedman, there is no basis to conclude that a waiver of the opt-out fee is "necessary" under federal antidiscrimination laws. Dudley v. Hannaford Bros., 333 F.3d 299, 307 (1st Cir. 2003).

As a result, to resolve CMP's standing challenge, we must assess whether the district court properly excluded the treating physicians' testimony, and if not, whether that testimony is enough to create a genuine dispute about whether smart meters pose a risk to Friedman's health. To the extent that the jurisdictional and merits issues in this case are substantially intertwined, we may evaluate them through a "single inquiry." 13B Wright & Miller, supra, § 3531.15; cf. Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 n.3 (1st Cir. 2001) (observing that courts may "defer resolution of . . . jurisdictional issue[s]" when the "jurisdictional facts . . . are inextricably intertwined with the merits of the case"); Concilio de Salud Integral de Loíza, Inc. v. Pérez-Perdomo, 625 F.3d 15, 19 (1st Cir. 2010) (acknowledging that

resolution of appellate jurisdictional issues may "overlap" with the merits).  We adopt that approach here.[7]

## B. Causation

Moving to the parties' arguments on the merits, "[w]e review a district court's grant of summary judgment de novo, taking the record in the light most favorable to the nonmoving party," here, Friedman.  Appleton v. Nat'l Union Fire Ins., 145 F.4th 177, 184 (1st Cir. 2025) (quoting Sutherland v. Peterson's Oil Serv., Inc., 126 F.4th 728, 737 (1st Cir. 2025)).  "Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id. (internal quotation marks omitted) (quoting Sutherland, 126 F.4th at 737).

Friedman contends that CMP failed to provide him with a reasonable accommodation in violation of the ADA, the FHA, and the Rehabilitation Act.  As the parties observe, we generally apply the same legal standard to evaluate discrimination claims under these three statutes.  See Summers v. City of Fitchburg, 940 F.3d

_____

[7] To be clear, by evaluating standing and the merits together in this appeal, we do not suggest that Friedman lacked standing to bring this lawsuit in the first place.  Nor do we suggest that the district court erred by denying CMP's motion to dismiss and allowing this case to proceed to discovery.  At the motion to dismiss stage, a plaintiff only needs to plead facts that make a plausible case for standing.  See Hochendoner v. Genzyme Corp., 823 F.3d 724, 734 (1st Cir. 2016).  Here, Friedman did so by alleging that CMP disconnected his electricity service after he refused to pay the opt-out fee.

133, 139 (1st Cir. 2019) (stating that "the elements of reasonable accommodation claims under the FHA[] and the ADA do not differ in any meaningful respect"); Serrano-Colon v. DHS, 121 F.4th 259, 274 n.20 (1st Cir. 2024) (noting that "[t]he same standards . . . apply to claims under the ADA and under the Rehabilitation Act"); cf. Astralis Condo. Ass'n v. Sec'y, HUD, 620 F.3d 62, 66 (1st Cir. 2010) (noting that "authority under the [ADA] is generally persuasive in assessing handicapped discrimination claims under the FHA[]").  Thus, we address Friedman's reasonable accommodation claims primarily under the ADA, although our analysis applies with equal force to his corresponding FHA and Rehabilitation Act claims.

Title III of the ADA prohibits discrimination against people with disabilities "by privately operated places of public accommodation." Dudley, 333 F.3d at 303.  CMP agrees that Friedman is a person with a disability and that CMP qualifies as a "place[] of public accommodation" under Title III.  Id.

To bring a successful reasonable accommodation claim under Title III, Friedman was required to demonstrate that (1) CMP had "a discriminatory policy or practice in effect"; (2) he "requested a reasonable modification in that policy or practice which, if granted, would have afforded him [full and equal] access to the desired [service]"; (3) "the requested modification . . . was necessary to afford that access"; and

- 14 -

(4) CMP "nonetheless refused to modify the policy or practice." Id. at 307 (emphasis added); see 42 U.S.C. § 12182(b)(2)(A)(ii). On appeal, the parties' dispute focuses on whether the accommodation requested by Friedman was "necessary" given his medical condition.

Friedman argues that his requested accommodation -- waiver of the opt-out fee -- was "necessary" to afford him full and equal access to CMP's utility services. Dudley, 333 F.3d at 307. He maintains that the district court ruled otherwise because it erroneously applied a "certainty of causation" standard to evaluate necessity. Instead, he contends, his evidence that the smart meters "risk[ed] worsening his lymphoma's progression or symptoms" was enough to show "necessity."

We disagree with Friedman's characterization of the causation standard applied by the district court, but we need not linger on that issue. That is because even if we adopt Friedman's proposed causation standard, he failed to produce sufficient evidence to defeat summary judgment.

As Friedman admits, it was his obligation to provide evidence showing that CMP's smart meters posed a non-speculative risk of harm to him. The record here, however, falls short on this point. Importantly, Friedman does not dispute that he needed expert testimony to establish causation. Indeed, he offered two

experts -- Drs. Héroux and Carpenter -- to testify on that very issue. But because neither expert was familiar with Friedman's medical condition or his expected RF exposure from CMP's smart meters, the district court (in a ruling that Friedman does not challenge on appeal) limited their testimony to general causation. In effect, then, the experts were permitted to opine only on the potential impact of some amount of RF radiation on some cancer progression and symptoms. But they could not testify regarding the effect that exposure to smart-meter RF radiation might have on Friedman's cancer or treatment. Thus, without more, a reasonable jury could only speculate as to the health effects of CMP's smart meter on Friedman.

Friedman concedes that evidence of general causation is not enough to defeat CMP's summary judgment motion. He even acknowledges that additional "testimony is necessary to link those [general] findings to . . . [himself], specifically." But the quandary for Friedman is that his only evidence of specific causation derives from the proffered opinions of his treating physicians. And the district court excluded their opinions, leaving the record devoid of any evidence connecting Friedman's accommodation request to his condition and symptoms. Friedman challenges that ruling -- an issue we take up next. We reiterate, however, that without evidence of specific causation, Friedman cannot bring his disability claims to trial.

### C. Treating Physicians' Opinions

We turn, then, to the district court's decision to exclude the testimony of Friedman's treating physicians, Drs. Benton and Goldbas, on timeliness grounds. We review that ruling for abuse of discretion. See Samaan v. St. Joseph Hosp., 670 F.3d 21, 35 (1st Cir. 2012) (applying abuse of discretion standard of review to "the finding that a discovery violation occurred and . . . to the appropriateness of the sanction selected" (quoting Santiago-Díaz v. Laboratorio Clínico y de Referencia del Este, 456 F.3d 272, 275 (1st Cir. 2006))).

Friedman contends that we should reverse the district court's ruling because the treating physicians are properly categorized as "fact" witnesses, and thus he had no obligation to disclose them as experts. Alternatively, he claims that there was no prejudice to CMP from his late disclosure. As we explain, we disagree on both counts.

### 1. Expert or Lay Opinion?

To begin, the district court did not abuse its discretion in concluding that the relevant portions of the treating physicians' proffered testimony amounted to expert opinions. Lay witnesses may offer opinion testimony but only when those opinions are (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or

to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge."  Fed. R. Evid. 701.

Opinions offered by treating physicians often straddle the line between lay and expert testimony because treating physicians "are percipient witnesses who also possess specialized knowledge."  United States v. Betro, 115 F.4th 429, 450 (6th Cir. 2024).  Other circuits have navigated this complexity by permitting treating physicians to testify "to their first-hand observations and treatment of a patient without being qualified as experts." Id. (internal quotation marks omitted) (quoting United States v. Wells, 211 F.3d 988, 998 (6th Cir. 2000)); see Davoll v. Webb, 194 F.3d 1116, 1138 (10th Cir. 1999); cf. Gómez v. Rivera Rodríguez, 344 F.3d 103, 113 (1st Cir. 2003) (observing that "[b]y and large, courts have . . . ruled that a treating physician, testifying as to his consultation with or treatment of a patient, is not an expert witness").  But when a treating physician goes further -- for example, by "hypothesi[zing]" about the cause or nature of an illness or "provid[ing] explanations" that go beyond their own experiences in treating the patient -- our sister circuits have held that the witness must be qualified as an expert under Federal Rule of Evidence 702.  Williams v. Mast Biosurgery USA, Inc., 644 F.3d 1312, 1317-18 (11th Cir. 2011) (concluding that a treating physician may not "hypothesi[ze]" as a lay witness because doing so "crosses the line from lay to expert testimony");

see Betro, 115 F.4th at 450; see also Stephen A. Saltzburg et al., 3 Federal Rules of Evidence Manual § 701.02[7] (Matthew Bender 12th ed. 2019) (stating that "[w]hen the [treating] physician testifies that the plaintiff was coughing and running a fever, this is lay witness testimony," but "if the physician also testifies that he diagnosed the patient as having Reactive Airways Dysfunction Syndrome caused by exposure to a toxic chemical, then this is testimony based on scientific, technical, or other specialized knowledge and must be qualified under Rule 702").

Here, the treating physicians attempt to offer opinions on matters that go beyond their "first-hand observations" of Friedman's current symptoms or treatment plan. Betro, 115 F.4th at 450 (quoting Wells, 211 F.3d at 998). Instead, they seek to hypothesize about the potential causal effects of smart-meter RF radiation on Friedman's medical condition. See Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC, 71 F.4th 894, 907 (11th Cir. 2023) ("[A] hypothesis about causation is outside a lay witness's competency, even if the lay witness happens to have the expertise to draw such conclusions."). For example, Dr. Goldbas's declaration states that "having a smart meter . . . will have a negative effect on [Friedman's] cancer treatment and worsen [his] symptoms." Similarly, Friedman offers Dr. Benton's testimony to establish the "negative effect" that a smart meter would have "on [his] palliative treatment." These opinions rely on "specialized

knowledge" about the potential connection between RF radiation and cancer progression and treatment -- precisely the type of causation opinion reserved for qualified expert testimony. See Fed. R. Evid. 701, 702. As a result, the district court did not abuse its discretion by characterizing the challenged opinions of the treating physicians as expert, as opposed to lay, testimony.

## 2. The Prejudice of Untimely Disclosure

We turn next to Friedman's alternative argument that even if he should have designated the treating physicians as expert witnesses, the district court abused its discretion by excluding their testimony on timeliness grounds. Friedman has failed to convince us that we should overturn the court's decision.

Under Federal Rule of Civil Procedure 26(a)(2), litigants must disclose the identities of proposed expert witnesses, along with the subjects on which they will testify, by the court-ordered deadline. See Fed. R. Civ. P. 26(a)(2)(A)-(D). Although sanctions for failing to meet disclosure obligations may vary, the "baseline rule . . . in the ordinary case is mandatory preclusion." Harriman v. Hancock County, 627 F.3d 22, 29 (1st Cir. 2010) (quoting Santiago-Díaz, 456 F.3d at 276); see Fed. R. Civ. P. 37(c)(1).

Friedman does not dispute that he missed the deadline for disclosing his treating physicians as expert witnesses. The question, then, is whether the district court abused its discretion

in declining to overlook the late disclosure. We typically consider "an array of factors" when reviewing such a decision, including the party's "justification for the late disclosure"; the "harmlessness" to the opposing side; the "history of the litigation"; the "impact on the district court's docket"; and the "need for the precluded evidence." Harriman, 627 F.3d at 30.

We discern no abuse of discretion by the district court in declining to deviate from the "baseline rule." Id. at 29 (quoting Santiago-Díaz, 456 F.3d at 276). Friedman has offered "no justification for the late designation," which came more than two years after the disclosure deadline had passed. Samaan, 670 F.3d at 37. By that point, the litigation had proceeded for multiple years, and the court had granted multiple extensions of the disclosure deadline. What is more, the scheduling order had expressly identified "treating physicians" as possible expert witnesses, and Friedman "knew how to designate" them (as his designations of Drs. Héroux and Carpenter demonstrate). Id. at 36. Friedman also knew for at least a year before CMP moved for summary judgment that it was challenging his experts' testimony, yet "he took no steps to designate either [Dr. Benton] or [Dr. Goldbas] as a backup" expert during that time. Id. at 37.

Still, Friedman claims that his late disclosure was harmless because "[b]oth treating physicians were identified at the onset of the litigation" and "directly interacted with

- 21 -

CMP . . . prior to litigation." But CMP's general awareness of his treating physicians does not eliminate the "prejudice that would have attended an eleventh-hour decision to allow" Friedman to designate two additional causation experts. Samaan, 670 F.3d at 37. As Friedman acknowledges, CMP chose not to depose Dr. Goldbas, but it may have made a different strategic decision had it known that Dr. Goldbas would seek to testify on specific causation. And although CMP did depose Dr. Benton, its questions focused on the drafting of his letter to CMP, not on his opinion about specific causation. Thus, once the court deadline for disclosing expert witnesses had passed, CMP reasonably "pursued litigation strategies based on [its] justifiable understanding" that Drs. Héroux and Carpenter were Friedman's "only causation expert[s]." Id.

We appreciate that Friedman has a terminal illness and needs specific-causation evidence to prove his claims in this case. See id. (considering whether the plaintiff's "need for causation evidence was great"). The district court recognized as much. But the court carefully weighed the consequences of accepting the treating physicians' testimony and concluded that exclusion, although severe, was the proper sanction for Friedman's failure to

disclose them as experts several years earlier. Based on our review, that decision was within the district court's discretion.[8]

Without the treating physicians' testimony, the record lacks evidence of specific causation to demonstrate that Friedman's accommodation request is necessary, as required under the federal antidiscrimination statutes. His reasonable accommodation claims thus fail as a matter of law, and the district court was correct to grant summary judgment to CMP on these claims.

## D. Discriminatory Surcharge

Finally, Friedman challenges the district court's conclusion that the opt-out fee does not constitute a discriminatory surcharge under the ADA's implementing regulations. See 28 C.F.R. § 36.301(c). The regulations prohibit "a surcharge on a particular individual with a disability" to pay for "reasonable modifications in policies, practices, or procedures, that are required to provide that individual . . . with the nondiscriminatory treatment required by the [ADA]." Id. (emphasis added). If, however, the challenged fee "charges for a measure not required under the ADA, the inquiry ends." Dare v. California, 191 F.3d 1167, 1171 (9th Cir. 1999) (interpreting similar language in Title II's implementing regulations). As we have explained,

_____

[8] Because we discern no abuse of discretion by the district court in excluding the opinions of Drs. Benton and Goldbas, we need not consider whether summary judgment would have been improper had it considered their testimony.

- 23 -

the record lacks sufficient evidence demonstrating that an analog meter is necessary to provide Friedman with the full enjoyment of CMP's utility services.  Thus, a reasonable jury cannot conclude that waiver of the opt-out fee is "required" under the ADA.  28 C.F.R. § 36.301(c).  If waiver of the opt-out fee is not required, Friedman cannot demonstrate that paying the fee would amount to a discriminatory surcharge under the governing regulations, and the district court was correct to enter summary judgment for CMP on this claim as well.[9]

### III. CONCLUSION

For all these reasons, we **affirm** the district court's order granting summary judgment to CMP.

---

[9] Because we conclude that CMP was not charging a fee for an accommodation required under the ADA, we need not reach Friedman's challenge to the district court's conclusion that fees charged to all members of a class cannot be unlawful surcharges under 28 C.F.R. § 36.301(c) as a matter of law.  We leave that question for another day.