# United States Court of Appeals
## For the First Circuit

No. 24-1431

JESSE SUTHERLAND,

Plaintiff, Appellant,

v.

PETERSON'S OIL SERVICE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Margaret R. Guzman, U.S. District Judge]

Before

Rikelman, Selya, and Kayatta,
Circuit Judges.

Lucas Newbill, with whom Law Offices of Lucas Newbill was on brief, for appellant.

Jeremy D. Horowitz, with whom Karla Gilbride, Jennifer S. Goldstein, and Dara S. Smith were on brief, for the Equal Employment Opportunity Commission, amicus curiae.

Brian T. Dougan, with whom Cifra Dougan, LLP was on brief, for appellee.

January 16, 2025

**RIKELMAN**, <u>Circuit Judge</u>. Jesse Sutherland had a rocky eight-month period employed as an oil service technician at Peterson's Oil Service, Inc. ("Peterson's"). Two months into his new job with the company, Sutherland injured his right knee, tearing his meniscus in two places and damaging his patella. Because of his injury, Sutherland twice requested that Peterson's reduce the length of his workday. Eventually, he took a 12-week leave of absence to undergo knee surgery and recover. When he tried to return to work, in April 2020, Peterson's was not receptive. Instead, Sutherland learned that Peterson's had terminated him, effective the date he was supposed to return from leave, "due to lack of work during the COVID-19 pandemic." Sutherland ultimately sued Peterson's for disability discrimination and related claims. The district court granted summary judgment to Peterson's, and Sutherland appealed.

This case raises important questions about the governing standard for disability claims under the Americans with Disabilities Act (ADA), and the relationship between discrimination, retaliation, and failure to accommodate claims under that statute. Because we conclude that Sutherland provided sufficient evidence to survive summary judgment on his disability-related claims under the operative legal standard, we vacate in part and remand.

- 2 -

# I. BACKGROUND

In reviewing the district court's grant of summary judgment to Peterson's, we recite the facts in the record in the light most favorable to Sutherland. See Dixon-Tribou v. McDonough, 86 F.4th 453, 455 (1st Cir. 2023). Peterson's is a family-run company that provides heating oil, cooling, and energy services to homes and businesses. During the relevant period, Kristen Peterson Halus handled hiring, firing, and disability-related requests at the company. Sutherland's claims against Peterson's arise out of two distinct sets of facts: first, his knee injury; and second, his opposition to Clean Heat, Peterson's biofuel heat option.

## A. Sutherland's Knee Injury

Peterson's hired Sutherland as a service technician in August 2019. Ryan Morris served as Sutherland's supervisor and Diana Costigan was his main dispatcher. When Sutherland was hired, he negotiated with Peterson's so that he would not have to do installation work or cover night shifts (often referred to as "on-call" shifts by the parties); in exchange, Sutherland agreed to work Saturdays during the winter busy season when the office was open. Even so, Sutherland was assigned, and completed, installation work at least five times during his tenure at Peterson's.[1]

---

[1] Peterson's employed other technicians who either did not do

- 3 -

Sutherland injured his knee on October 8, 2019. That same day, he texted Costigan that he "hit [his] knee pretty bad and [it] swelled up." Sutherland did not bring up the knee injury again until about a month later, when he told Costigan that he would be "leaving after [his] 2nd tune up. My right knee is fully swollen I can't bend it [right]." On November 13, Costigan asked if Sutherland "ha[d] one more call in [him]"; Sutherland responded that he would "try," but that his knee was once again too swollen to bend. Two days later, Sutherland told Costigan that he had a doctor's appointment because his knee was "twice [its] normal size." Costigan asked if Sutherland would be in the following day, and Sutherland replied that he was not sure he could make it because his knee hurt so much he "would like [his] leg ripped off." Later that same day, after his doctor's appointment, Sutherland told Costigan that he was on "knee rest" and that he wouldn't be back to work until the following Monday. The Monday he returned, Costigan reassigned Sutherland's first call because of his knee problems.

On November 21, Sutherland texted Morris, his supervisor, to ask for "mercy" given his knee injury:

> Hi Ryan, As you may have heard I've seemingly developed knee problems. My right knees meniscus is torn pretty bad and my left is

___

installation work or did not work night shifts, but the record indicates that Sutherland was the only technician who, for the most part, did not do either.

- 4 -

almost the same but better. I had xrays yesterday and diagnosis. I have an MRI to follow very soon. The reason for this text is to ask for a bit of mercy . . . I'm going thr[ough] excruciating pain during my days working and just figured I'll push thr[ough]. My doctor said that attitude is fine but it's making me worse. So my question is, can I please cut back on [hours] to 40 per week? I can seem to muscle thr[ough] that and ice it at night. My doctor thought that was even to[o] much but I know Peterson needs the help. I can get you doctor documentation if you see it [necessary].

Sutherland then texted Costigan: "Just an fyi . . . Ryan [Morris] will probably tell you, I'm moving to 40 hr. [w]eeks 8 hr days due to my knees." Nothing in the record suggests that Morris or Peterson Halus ever implemented Sutherland's request for a 40-hour workweek and/or an eight-hour workday.

A few weeks later, on December 10, Costigan asked Sutherland if he would be "doing another call" around 3 p.m.; Sutherland responded that he would not be able to because of his knee. On December 13, Sutherland texted Costigan at 11:27 a.m., about 4.5 hours into his shift, that his current call would be "it for [him] today" because of his knee. Costigan nevertheless asked him if he could take one more call, and Sutherland agreed.

On December 18, Sutherland told Costigan he would be receiving knee surgery and texted her a picture of the letter he had received from his surgeon. The letter stated: "Jesse Sutherland was seen in my clinic on 12/17/2019. Due to his knee

pain and swelling it is my recommendation that he work part time six hours/day, 5 days/week starting on 12/18/19 until further notice."  (Sutherland explained in a text to Costigan that every night after work, he had to ice his knee "to get the swelling down enough to function again.")  The next day, Sutherland asked Costigan if she had passed the doctor's note on to Morris, and she responded that she had.  Peterson Halus testified that Morris informed her of Sutherland's work restrictions, as reflected in the doctor's note.  The record contains no evidence, however, that either Morris or Peterson Halus reached out to Sutherland about adjusting his schedule to a 30-hour workweek and/or six-hour workday.

Instead, Peterson's continued to schedule Sutherland for regular days, sometimes for up to nine hours.  Peterson's also continued to assign Sutherland to calls that, in Sutherland's view, exceeded his physical limitations given his knee injury.  When Sutherland asked to be removed from those assignments, Costigan would reassign him.  For instance, on December 20, Sutherland asked to be reassigned from a three-hour call to something "easier" on his knee; Costigan agreed.  On December 27, Costigan asked Sutherland if he could do another call; he responded that he could not bend his knee anymore, and no call was assigned.  On December 30, Sutherland completed an installation and then told Costigan that his knee was "done" for the day.  On January 20, Sutherland

told a different dispatcher that he would be unable to perform any installation work because of his knee.

Sutherland had knee surgery on January 27, 2020. Peterson's granted his request for medical leave for the surgery and post-surgery recovery. Although Sutherland did not provide a doctor's note supporting his request for leave or his return to work, the record does not indicate that Peterson's asked for one in either instance.

On April 8, 2020, Sutherland texted Peterson Halus to let her know he was cleared to return to work on April 20. Peterson Halus did not respond. On April 10, Sutherland reached back out and asked if it was "busy" at Peterson's, and Peterson Halus responded that "it's insane. I'll reach out later today." On April 14, Sutherland texted Peterson Halus for a third time:

> I still haven't heard back from you and I'm getting worried. I spoke to some of the other techs that are out on leave at this point and was thinking you probably wanted me to do the same? Or take a layoff? I'm just not sure what you want me to do seeing how I haven't been able to speak with you. Please let me know so I can prepare. My granddaughter stays here during the days being both her parents are in essential jobs, meaning I also have to be very careful of her by mixing with customers during coronavirus.

Again, Sutherland did not receive a response.

Sutherland maintains that he was never formally terminated. Instead, Peterson Halus wrote, but apparently never

sent, a termination letter dated May 26, 2020.  The letter, which was provided to Sutherland during discovery in this case, stated that his termination was "due to lack of work during the COVID-19 pandemic."  The letter listed the date of "effective termination" as April 20, 2020, the same day Sutherland told Peterson Halus his doctor had cleared him to return to work.

## B. Sutherland's Clean Heat Complaints

Peterson's provided several types of home heating fuel to its customers.  One of its products was "Clean Heat," which had a biofuel content of approximately 45 to 85 percent, much higher than standard home heating fuel.  According to Sutherland, most home heating systems are not designed to burn high-content biofuel, and Clean Heat caused routine failures in customers' systems.

Sutherland often shared his negative views about Clean Heat with Costigan over text message.  He also complained to customers and other Peterson's employees about Clean Heat.  For instance, in October 2019, Peterson's received a customer complaint that Sutherland had blamed Clean Heat for the customer's heating problems.  The day after receiving that complaint, a Peterson's employee reported to Peterson Halus that Sutherland had been complaining about biofuel to another technician; Peterson Halus then requested that Costigan stop sending Sutherland on Clean Heat service calls "before he tells all of our customers we are delivering bad fuel."  Sutherland also said he mentioned his

concerns to Peterson Halus directly when he was asked to work on her father's oil pump, telling her that biofuel caused his pump to deteriorate. In his deposition, Sutherland stated that he shared with other technicians pictures of oil burners he believed had been ruined by biofuel.

Peterson's entered into a consent decree with the Commonwealth of Massachusetts regarding Clean Heat in March 2021. A state investigation concluded that Peterson's had violated two state consumer-fraud statutes because the company had not disclosed the actual percentage of biofuel in its Clean Heat product. The investigation did not indicate that Peterson's had sold a product that posed a safety risk to customers, and Peterson's did not concede that any of the state's findings on consumer fraud were accurate.

## C. Procedural History

Sutherland filed his operative complaint in this case on June 17, 2022.[2] Of the claims he included in that complaint, only a subset are at issue on appeal: disability discrimination and retaliation in violation of the ADA; and Massachusetts state-law claims alleging disability discrimination and failure to accommodate, as well as termination in violation of public policy

---

[2] The parties do not dispute that Sutherland exhausted his administrative remedies prior to filing suit in federal court.

based on Sutherland's opposition to Clean Heat.[3]  After discovery was completed, Peterson's moved for summary judgment on all counts, and the district court granted the motion in full.  Sutherland v. Peterson's Oil Serv., Inc., No. 21-cv-10902, 2024 WL 1924251 (D. Mass. Mar. 31, 2024).  This timely appeal followed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, taking the record in the light most favorable to the nonmoving party (here, Sutherland).  Mancini v. City of Providence, 909 F.3d 32, 38 (1st Cir. 2018) (citing Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011); Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 204-05 (1st Cir. 2006)).  Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Mancini, 909 F.3d at 38 (quoting Avery, 661 F.3d at 693).

## III. DISCUSSION

Sutherland argues that Peterson's failed to accommodate his disability while he worked for the company, then terminated him because of this past disability and/or in retaliation for Sutherland seeking a modified work schedule.  We conclude that the district court, in granting summary judgment to Peterson's, overlooked the operative standards under the ADA in evaluating

---

[3] On appeal, Sutherland has abandoned the other claims in his complaint.

- 10 -

whether Sutherland had provided sufficient evidence to establish that his knee injury qualified as a disability.[4] Similarly, we determine that the court did not fully credit the legal independence of the retaliation and failure to accommodate claims.

Because the question of whether Sutherland could be considered disabled under federal and state law during his time at Peterson's is central to all his disability-related claims, we begin our analysis there. After completing our review of the disability-related claims, we end by considering Sutherland's alternate claim that Peterson's violated Massachusetts law by terminating him because of his opposition to Clean Heat.

## A. Discrimination

The ADA prohibits a "covered entity" -- such as Peterson's -- from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Massachusetts law similarly makes it unlawful "[f]or any employer . . . to dismiss from employment . . . or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person." Mass. Gen. Laws ch. 151B, § 4(16). We apply the same

---

[4] We note that the district court was likely led astray by Peterson's, which did not discuss the later amendments to the ADA in its briefing and only briefly mentioned the key, on-point decision from our court, Mancini.

- 11 -

legal framework to analyze disability discrimination claims under both federal and Massachusetts law. See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012).

The familiar three-part McDonnell Douglas burden-shifting framework governs disability discrimination claims like Sutherland's, which are based on indirect evidence. See Mancini, 909 F.3d at 38 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). But we do not march through the three steps of the framework here because the district court concluded that Sutherland stumbled at the starting gate: It determined that he did not put forward enough evidence to establish a prima facie case of disability discrimination. Thus, we evaluate only the record evidence relevant to Sutherland's prima facie case and remand to the district court to consider in the first instance whether Sutherland also survives summary judgment on the remaining steps of the McDonnell Douglas analysis.

A prima facie case of disability discrimination has three elements. Sutherland must show that he "(1) has a disability within the meaning of the ADA; (2) is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) was subject to an adverse employment action based in whole or part on his disability." Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011). The district

- 12 -

court concluded that Sutherland failed at the get-go because he did not provide sufficient evidence of a disability.  We disagree.

### 1. "Disability" Under the ADA

A disability under the ADA includes "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A)-(C).  Thus, a plaintiff can show that they have a current disability, a record of a past disability, or simply that the employer regards them as disabled to meet this definition.  Further, the Americans with Disabilities Act Amendments Act of 2008 (ADAAA) makes clear that "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter."  Id. § 12102(4)(A).  Indeed, Congress enacted the ADAAA as an express rejection of the Supreme Court's overly strict interpretation of "disability."  See ADAAA, Pub. L. No. 110-325, § 2(b)(3)-(4), 122 Stat. 3553, 3554 (2008); see also id. § 2(a)(4), (5) (explaining in "Findings and Purposes" that Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002), and Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), "narrowed the broad scope of protection" the ADA was intended to afford).

Congress also specifically instructed the Equal Employment Opportunity Commission (EEOC) to enact regulations to

implement this broad scope of protection.  42 U.S.C. § 12205a.[5]

These implementing regulations make clear, contra Toyota, 534 U.S. at 198, that an injury need not be permanent or long term to be considered sufficiently severe and thus, qualify as an "impairment."  See 29 C.F.R. § 1630.2(j)(1)(vii)-(ix) (2024); see also Mancini, 909 F.3d at 40 (explaining that the ADAAA "defenestrated [Toyota's] requirement").  These regulations also clarify that major life activities are "not determined by reference to whether [they are] of 'central importance to daily life,'" and that "the term 'major' shall not be interpreted strictly to create a demanding standard for disability."  29 C.F.R. § 1630.2(i)(2) (2024) (citing ADAAA § 2(b)(4)); see Brief for Equal Employment Opportunity Commission Supporting Appellant at 10-13, Sutherland v. Peterson's Oil Serv., No. 24-1431 (1st Cir. Aug. 13, 2024) (hereinafter "Amicus Br. for EEOC").

The district court began its analysis by determining that Sutherland's knee injury did not qualify as a disability as a matter of law.  The court held that (i) his injury could not be an impairment because it was only "temporary" and (ii) a doctor's

---

[5] In Section 12205a, Congress granted the EEOC "the authority to issue regulations implementing the definitions of disability in section 12102 of this title (including rules of construction) and the definitions in section 12103 of this title, consistent with the ADA Amendments Act of 2008."  This is a quintessential example of Congress "expressly delegat[ing] to an agency the authority to give meaning to a particular statutory term."  Loper Bright Enters. v. Raimondo, 603 U.S. 369, 394 (2024) (cleaned up).

note and Sutherland's own statements about his knee pain were insufficient to establish that the injury was a substantial limitation. Those rulings were inconsistent with the ADAAA and our precedent.

As we explained, in enacting the ADAAA, Congress expressly rejected previous Supreme Court precedent and concluded that a temporary injury can qualify as a disability if it is sufficiently severe. Mancini, 909 F.3d at 40-41; 29 C.F.R. § 1630.2(j)(1)(ix) (clarifying that there is no longer a six-month requirement for an "impairment"); see also Amicus Br. for EEOC at 13-14. In any event, the record shows that Sutherland's knee injury met the former six-month legal requirement for an impairment; he injured his knee on October 8, 2019, and was not cleared to return to work until April 20, 2020. Thus, the mere fact that Sutherland's injury was not permanent did not preclude that injury from being considered a "disability" under the ADA.

Further, there is "no per se rule about either the type or quantum of evidence" a plaintiff needs to establish that an impairment exists. Mancini, 909 F.3d at 39. As we have held, "some conditions plainly fall within the universe of impairments that a lay jury can fathom without expert guidance," and one of those conditions is "a knee injury." Id. at 42. Thus, to the extent that the district court faulted Sutherland for failing to

- 15 -

produce additional medical evidence to prove his impairment, we reiterate that our precedent does not require such evidence.

Medical evidence also is not always necessary to prove that an impairment constitutes a "substantial limitation" on a major life activity. In our view, a lay jury would have no difficulty "grasping the connection between a knee injury and problems in conducting major life activities such as standing, walking, and bending." Id. at 43. To be sure, Mancini makes clear that a plaintiff cannot rely on "wholly conclusory allusions to substantially limited performance of major life activities" to avoid summary judgment. Id. at 44. But Sutherland's contemporaneous messages to Costigan and Morris exceed that bar. Sutherland explained, in vivid detail, that at times his knee hurt so badly he wished that his leg would be "ripped off." He also told Costigan on many occasions that his knee was so swollen he could not bend it, and that after working long days, he would have to ice his knee to reduce the swelling enough to use it at all. Given these undisputed facts, we conclude that Sutherland provided sufficient evidence that his knee injury was an "actual disability" to survive summary judgment.

For the same reasons, Sutherland has demonstrated a "record of" a disability for the period following his recovery from surgery. See id. at 40. As we have said, "actual disability" and "record of" disability are "two sides of the same coin," and

a "record of" disability "may be satisfied by a showing that the plaintiff had a disability in the past (even though he no longer suffered from that disability when the allegedly discriminatory action took place)."  Id.

Sutherland also meets the "less demanding" standard for demonstrating that Peterson's "regarded [him] as" disabled, given that it is undisputed that Peterson's "was either aware of or perceived the impairment [his knee injury presented] at the time" it terminated him.  See id. at 46.  Relying on older case law, the district court held that a "regarded as" claim required Sutherland to show that Peterson's viewed him as having an impairment that substantially limited his major life activities.  Sutherland, 2024 WL 1924251, at *4.  But critically, under the ADAAA, "[i]t is not necessary for [Sutherland] to prove that [his] impairment limits or is perceived to limit a major life activity" to proceed on a "regarded as" claim.  Mancini, 909 F.3d at 46 (emphasis added).

**2. Qualified Individual**

We now turn to the next element of Sutherland's prima facie disability discrimination case -- whether he was a "qualified individual."  Under the ADA, to have a viable claim, Sutherland must demonstrate that, despite his disability, he was "able to perform the essential functions of [his] position with or without reasonable accommodation."  Sarkisian v. Austin Preparatory Sch., 85 F.4th 670, 675 (1st Cir. 2023) (cleaned up).  The district court

- 17 -

credited Peterson's argument that Sutherland was not a qualified individual because installation work and night shifts were "essential functions" of the service technician position. We disagree.

The record shows a genuine dispute of material fact about whether Sutherland was a "qualified individual." "Essential functions" are "fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1) (2024). "Factors to be considered" in evaluating whether a function is essential "include the employer's judgment, written job descriptions, the work experience of past incumbents of the job, and the current work experience of incumbents in similar jobs." Nationwide Life Ins. Co., 696 F.3d at 88. In conducting this analysis, courts grant a "significant degree" of deference to the first factor, the employer's judgment. Jones v. Walgreen Co., 679 F.3d 9, 14 (1st Cir. 2012).

Viewing the evidence in the light most favorable to Sutherland, and deferring to Peterson's business judgment, leads us to conclude that a reasonable jury could find that installations and night shifts were not "essential functions" of the service technician position. That is because Peterson's hired Sutherland -- before he had any history of injury -- on the express understanding that he would not perform these duties. There is also evidence that other service technicians either did not perform

installations or did not take night shifts.  Although Sutherland appears to be the only technician who requested not to do both types of work, a jury could credit the evidence that Peterson's did not universally require its technicians to perform these duties to conclude that the company did not view them as "essential."[6]

### 3. Adverse Employment Action

Moving to the last part of the prima facie case, Sutherland must establish that he suffered an "adverse employment action" based, in whole or in part, on his disability (whether that be because he had an ongoing disability, a record of disability, or was regarded as disabled).  The district court did not reach this final element of the analysis, but given the record, we conclude it is appropriate for us to address it on appeal.  See United States v. Kin-Hong, 110 F.3d 103, 116 (1st Cir. 1997) ("[W]e do have discretion to address issues not reached by the district court when the question is essentially legal and the record is

---

[6] Peterson's also contends that "completing an entire service call and finishing a repair" were "essential functions" of the job, and that Sutherland's request for a reduced-hour workweek rendered him unable to perform those functions.  In this particular case, Peterson's argument is really a challenge to the reasonableness of Sutherland's accommodation request.  See Nationwide Life Ins. Co., 696 F.3d at 88 ("qualified individual" and "reasonable accommodation" requirements are "interrelated"); cf. Faidley v. United Parcel Serv. of Am., Inc., 889 F.3d 933, 941 (8th Cir. 2018) (analyzing claim that 9.5 hour workday was "essential function" where employer provided evidence that working overtime was part of job description and collective bargaining agreement).  We therefore address that argument in Part C.

complete."). The effective date of Sutherland's termination, April 20, 2020, was the same day his doctor cleared him to return to work after knee surgery. That timing, we think, is enough for a reasonable jury to infer a causal connection between his disability (at least his "record of" and "regarded as" claims) and the discharge. See Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 27 (1st Cir. 2015) ("Such temporal proximity, we have held, itself provides support for the inference that a discriminatory motive explains the subsequent . . . firing."). Thus, Sutherland put forward enough evidence to survive summary judgment on his prima facie case of discrimination.

We note that on remand, to evaluate whether the discrimination claim can proceed to a jury, the district court will have to consider whether Peterson's has put forward a legitimate, nondiscriminatory reason for firing Sutherland, and whether Sutherland has introduced sufficient evidence to show that this proffered reason -- business slowdown during the COVID-19 pandemic -- was pretextual. See Adamson v. Walgreens Co., 750 F.3d 73, 79 (1st Cir. 2014) ("Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." (quoting

Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662-63 (1st Cir. 2010))); see also Ripoli v. Dep't of Hum. Servs., No. 23-1970, 2024 WL 5116941, at *5-9 (1st Cir. Dec. 16, 2024).

## B. Retaliation

We turn next to Sutherland's retaliation claim. The district court did not consider the merits of this claim, ruling that it was duplicative of Sutherland's failure to accommodate claim. But as we will explain, Sutherland's retaliation claim is distinct from both of his other disability-related claims.

The ADA's anti-retaliation provision provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Sutherland asserts that Peterson's terminated his employment in retaliation for his requests for a modified work schedule and post-surgery medical leave.

As we described above, the crux of Sutherland's retaliation claim is that he was fired because he sought an accommodation for his knee injury. The success of that claim does not rise or fall with the failure to accommodate claim itself. As the EEOC points out, a jury could find "that Peterson's was willing to accommodate Sutherland's requests for reduced hours and medical

- 21 -

leave initially, but subsequently terminated him in retaliation for having availed himself of those accommodations." Amicus Br. for EEOC at 32-33. Sutherland's retaliation claim, based on his protected conduct of requesting an accommodation, similarly does not depend on whether Sutherland's knee injury qualified as a disability under the ADA. See Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997) (holding that a plaintiff "may assert such a [retaliation] claim even if the underlying claim of disability fails").

We therefore remand for the district court to consider the merits of Sutherland's retaliation claim under the McDonnell Douglas framework. See Carreras v. Sajo, García & Partners, 596 F.3d 25, 36 (1st Cir. 2010) (applying McDonnell Douglas to retaliation claims). Under that framework, the same legal standards will apply to Sutherland's arguments about pretext for both his discrimination and retaliation claims.

### C. Failure to Accommodate

As his final disability-related claim, Sutherland contends that Peterson's failed to accommodate his reasonable requests for a reduced-hour workweek while he was still employed by the company.[7] Importantly, "[t]he federal statutes barring

_____

[7] Sutherland brings this claim under Massachusetts state law only. As with Sutherland's other disability-related claims, the analysis under Massachusetts law is virtually identical to the

discrimination based on disability do more than merely prohibit disparate treatment; they also impose an affirmative duty on employers to offer a 'reasonable accommodation' to a disabled employee." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 19-20 (1st Cir. 2004).

To assert a claim for failure to accommodate, a plaintiff must show that they have a disability within the meaning of the ADA; that they are a qualified individual in that they can perform the essential functions of the job, either with or without an accommodation; and that the employer knew about plaintiff's disability and did not reasonably accommodate it. See id. at 20; see also Nationwide Life Ins. Co., 696 F.3d at 89. Because we addressed the first two parts of this test in our discrimination analysis, we focus here on the last element.

To demonstrate that Peterson's knew about his disability, Sutherland was required to make a "sufficiently direct and specific" accommodation request and "explain how the

---

analysis under the ADA. The only distinction is that Massachusetts law requires Sutherland to prove that he "suffered some harm" as a result of the failure to accommodate. See Stratton v. Bentley Univ., 113 F.4th 25, 52 (1st Cir. 2024) (quoting Alba v. Raytheon Co., 809 N.E.2d 516, 522 n.9 (Mass. 2004)). Although the parties do not address whether or not this element was met, Sutherland submitted sufficient evidence at the summary judgment stage to show that he was harmed when Peterson's required him to work extra hours on a painful, injured knee. Thus, we analyze the rest of Sutherland's state-law failure to accommodate claim as we would an ADA claim.

accommodation [was] linked" to his disability. <u>Nationwide Life Ins. Co.</u>, 696 F.3d at 89. To establish that Peterson's acted unreasonably, Sutherland must "show . . . that the proposed accommodation would [have] enable[d] [him] to perform the essential functions of [his] job, [and] also that, at least on the face of things, it [would have been] feasible for [Peterson's] under the circumstances." <u>Tobin</u> v. <u>Liberty Mut. Ins. Co.</u>, 553 F.3d 121, 136 (1st Cir. 2009) (quoting <u>Reed</u> v. <u>LePage Bakeries, Inc.</u>, 244 F.3d 254, 259 (1st Cir. 2001)). If Sutherland satisfies this burden, Peterson's must "demonstrate that the accommodation would impose an undue hardship on the operation of [its] business" to defeat the claim. <u>Id.</u> (quoting 42 U.S.C. § 12112(b)(5)(A)). Mere assertions are insufficient: The employer must "produce at least some modicum of evidence" of the asserted hardship, "financial or otherwise." <u>Calero-Cerezo</u>, 355 F.3d at 23 (quoting <u>Ward</u> v. <u>Mass. Health Rsch. Inst., Inc.</u>, 209 F.3d 29, 37 (1st Cir. 2000)).

An employer is often obligated to engage in an "informal, interactive process" with the employee to determine whether a reasonable accommodation exists. 29 C.F.R. § 1630.2(o)(3). "The scope of the employer's obligation in this process is not crystal clear, but '[t]he employer has at least some responsibility in determining the necessary accommodation,' since 'the regulations envision an interactive process that requires participation by

both parties.'" Calero-Cerezo, 355 F.3d at 24 (quoting 29 C.F.R. § 1630.2(o)(3)). "An employer's refusal to participate in the process may itself constitute evidence of a violation of the statute." Id. We assess whether the employer's failure to engage in the interactive process violated the ADA "on a case-by-case basis." EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 n.5 (1st Cir. 2014) (quoting Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir. 2001)).

The district court rejected Sutherland's failure to accommodate claim, but we disagree with its legal analysis for three reasons. We address each in turn.

First, the district court concluded that Sutherland had not put Peterson's on notice that his request for a reduced work schedule was related to his knee injury, because the request predated "the doctor's note" about surgery for that injury and thus could not be "link[ed]" to it.[8] But Sutherland's November 2019 text message to Morris (which we presume the district court treated as his request for an accommodation) explained that he was requesting a reduced schedule because his meniscus was "torn pretty bad" and he was in "excruciating pain." In the context of the parties' prior discussions about Sutherland's knee and his work

---

[8] For its part, Peterson's does not appear to contest that Sutherland's request for a reduced-hour workweek was "sufficiently direct and specific" and "linked" to his knee injury.

schedule, that description was "sufficiently direct and specific" for a jury to conclude that Peterson's was "on notice" that Sutherland was requesting a reduced work schedule because of his knee injury, even without the addition of a doctor's note. See Ballard v. Rubin, 284 F.3d 957, 962 (8th Cir. 2002) ("What matters . . . are not formalisms about the manner of the request," but whether "the employer can be fairly said to know of both the disability and desire for an accommodation." (citation omitted)). Further, Sutherland made another request for a reduced work schedule on December 18, 2019: That request accompanied the doctor's note explaining that Sutherland needed surgery and so did not predate it. The district court's opinion, however, does not mention this second request.

Next, the district court concluded that, in any event, Sutherland's accommodation request was not "reasonable" when considered alongside his other job-related preferences. In our view, however, Sutherland's previous request not to do installation work and night shifts cannot be considered as part of his disability accommodation request. Peterson's had agreed that Sutherland would not do this type of work when it offered him the job, well before his knee injury.

Accordingly, we turn to the district court's ultimate conclusion that Sutherland's request for a reduced-hour work schedule was unreasonable. Congress has identified "part-time or

modified work schedules" as examples of possible reasonable accommodations, which suggests that Sutherland's request for a shorter work schedule was reasonable "at least on the face of things." See 42 U.S.C. § 12111(9)(B); Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008) (quoting Reed, 244 F.3d at 259). Sutherland also showed that Peterson's employee handbook defined "part-time employee[s]" as those who "regularly work less than thirty (30) hours per week," and Peterson's had a part-time employee on staff.[9] That evidence was sufficient to allow a factfinder to conclude that Sutherland's request for an identical schedule was reasonable.

Because the district court erroneously concluded Sutherland had not made a reasonable request for an accommodation, it never addressed whether there was a genuine dispute of material fact about "undue hardship." We therefore remand to the district court to decide that issue in the first instance.

Finally, we note that Peterson's never formally responded to either of Sutherland's two requests for a reduced-hour workday.[10] On remand, the district court should consider whether

---

[9] Along with supporting Sutherland's assertion that his request for a similar schedule was reasonable, this evidence is relevant to Peterson's contention, discussed supra note 6, that working a full day was an "essential function" of the oil service technician job.

[10] The district court suggested that Peterson's had nonetheless fulfilled its obligations as an employer because it

Peterson's actions amounted to a failure to engage in the interactive process contemplated by Massachusetts law, and whether that failure was itself "a violation of" anti-discrimination law or at least evidence that Peterson's was acting unreasonably. See Calero-Cerezo, 355 F.3d at 24 (citing Jacques v. Clean-Up Grp., Inc., 96 F.3d 506, 515 (1st. Cir. 1996)).

## D. Wrongful Termination

We now turn to Sutherland's state-law claim that he was wrongfully terminated in violation of public policy because of his opposition to Clean Heat. Under Massachusetts law, at-will employment is terminable "without notice, for almost any reason or for no reason at all." Jackson v. Action for Bos. Cmty. Dev., Inc., 525 N.E.2d 411, 412 (Mass. 1988). The Massachusetts Supreme Judicial Court (SJC) has recognized narrow exceptions to that rule when the employee is terminated "contrary to a well-defined public policy." Wright v. Shriners Hosp. for Crippled Child., 589 N.E.2d 1241, 1244 (Mass. 1992).

The list of such public policies is narrow: "[R]edress is available for employees who are terminated 'for asserting a legally guaranteed right (e.g., filing [a] workers' compensation

---

granted Sutherland's accommodation request on an "informal basis." But a jury might reasonably find a difference between a set, reduced-hour work schedule that an employee can rely upon and requiring an employee to make a new request each time his normal workday becomes physically unmanageable.

claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).'" Flesner v. Tech. Commc'ns Corp., 575 N.E.2d 1107, 1110 (Mass. 1991) (quoting Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 533 N.E.2d 1368, 1371 (Mass. 1989)). Legal relief may also be available "in certain circumstances for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed." Id. at 1111; accord Meehan v. Med. Info. Tech., Inc., 177 N.E.3d 917, 920 (Mass. 2021).

On the other hand, "the internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception." King v. Driscoll, 638 N.E.2d 488, 492 (Mass. 1994). That is true "even though the employee['s] actions may be considered appropriate and 'socially desirable.'" Mercado v. Manny's T.V. & Appliance, Inc., 928 N.E.2d 979, 983 (Mass. App. Ct. 2010) (quoting Falcon v. Leger, 816 N.E.2d 1010, 1018 (Mass. App. Ct. 2004)). "It is a question of law for the judge to decide whether a retaliatory firing of an at-will employee in [the] given circumstances would violate public policy." Murray v. Warren Pumps, LLC, 821 F.3d 77, 90 (1st Cir. 2016) (quoting Wright, 589 N.E.2d at 1243) (cleaned up).

We agree with the district court's grant of summary judgment to Peterson's on this claim, although for a different

reason. The district court determined that Sutherland's claim failed because "there was no evidence that [he] reported his concerns to anyone outside of Peterson's." Sutherland, 2024 WL 1924251, at *7. But the law does not require that the employee report his concerns outside the workplace. Falcon, 816 at 1018 ("[W]e look essentially to the substance of the complaint rather than to whom it is presented."); cf. Mello v. Stop & Shop Cos., 524 N.E.2d 105, 108 n.6 (Mass. 1988) ("We assume . . . that an at-will employee who 'blew the whistle' within his company on wrongdoing is entitled to protection . . . ."). And the record indicates that Sutherland did inform individuals outside of Peterson's about his views on biofuel, in particular Peterson's customers. For example, an email from an employee to Peterson Halus states that a customer called to inform the company that "[h]e just had a service call and the tech [Sutherland] said it was the bio[fuel]." Further, Peterson Halus asked Costigan if she could try to send Sutherland "on things like follow up calls vs no heats so we can assess whats going on before he tells all the customers we are delivering bad fuel."

In our assessment, Sutherland's claim fails because he has not pointed to any clear or well-defined public policy supporting his personal views that biofuel is dangerous. Sutherland testified that based on his experience, biofuel was more likely than other types of fuel to leak out of a

non-combustion oil burner; oil leaks, in turn, could pose fire hazards. The only other evidence Sutherland produced, besides his own experience, were maintenance manuals from oil burner companies cautioning that the burners were not compatible with certain fuel types, including high-percentage biofuel. Sutherland did not testify that he knew of any injury, whether from a fire or otherwise, that had resulted from improper biofuel usage. In fact, the Massachusetts Attorney General's Office investigated Peterson's biofuel products and concluded that the company was violating consumer fraud laws but not any safety-related state laws or policies. Cf. Mistishen v. Falcone Piano Co., 630 N.E.2d 294, 296 (Mass. App. Ct. 1994) (finding no wrongful termination where employer, "but for its [false] representations, did nothing that the law forbids").

Commonwealth courts have consistently required more than an employee's own belief in wrongdoing to apply the public-policy exception, such as statutes or government-issued regulations that indicate the legislature, too, was concerned about the problems the employee has identified. See Wright, 589 N.E.2d at 1244 (looking to whether "the Legislature had clearly expressed a policy encouraging [plaintiff's behavior]" (citing Flesner, 575 N.E.2d at 1111)). For instance, in Falcon, the employee "presented ample evidence," sufficient to support a finding of violation of public policy, that the employer was manufacturing subpar electric wiring

(which increased the likelihood of electrical safety issues and fire hazards) in violation of the Massachusetts electrical code. 816 N.E.2d at 1019.  This evidence included testimony from an independent inspector and from the employer himself, who detailed the issues that could follow from inadequately manufactured electrical wiring.  Id. at 1013-16.

Similarly, in Mercado, the appeals court concluded that Mercado's employer was violating a "well-defined, important public policy" by allowing Mercado to perform appliance installations without holding a license.  928 N.E.2d at 983-84.  The court analyzed the Commonwealth's electrical and plumbing code, which contained the applicable licensure requirement, and concluded that there was "no question that the intent of the . . . code [wa]s to protect public health, safety, and welfare."  Id.  The court also noted that "[t]he importance of licensed electricians and qualified plumbers [wa]s underscored" by Mercado's own testimony that "he caused a gas leak, requiring the daughter of a customer to seek medical care."  Id. at 984.  No such facts are present here.  See Murray, 821 F.3d at 91 (affirming summary judgment for the employer where there was "no evidence that [the employer] asked [plaintiff] to deceive anyone about the legality of the company's conduct," the company "attempted to subvert [plaintiff's] performance of his job . . . in order to mask the company's

- 32 -

suspected illegal conduct," or "[plaintiff's] welding complaints directly implicated public health and safety").

By contrast, we find Sutherland's claim to be much closer to the claim that the SJC rejected in Wright. There, the plaintiff (a nurse) was fired after she "criticized . . . the quality of care rendered to patients" at the hospital where she worked. 589 N.E.2d at 1243. Although she could point to no statute that regulated the type of patient care at issue, she relied on a regulation promulgated by the Board of Nursing describing the responsibilities of nurses to "ensure quality and continuity of care" as the basis for the "public policy" protecting her conduct. Id. at 1245.

Here too, Sutherland has not cited any statute but rather appears to rely on oil burner service manuals as his source of public policy. Even if such manuals constituted "regulations," the SJC in Wright declined to accept "regulation[s] governing a particular profession" as "source[s] of well-defined public policy." Id. Thus, the nurse in Wright was not "immune from the general at-will employment rule," despite "reporting on issues that [she] fe[lt] [we]re detrimental to health care." Id. On the same logic, we affirm the district court's decision that Sutherland's wrongful termination claim based on an alleged violation of public policy fails as a matter of law.

## IV. CONCLUSION

For all these reasons, we **vacate** the grant of summary judgment on Sutherland's discrimination and retaliation claims under the ADA, and his discrimination and failure to accommodate claims under Mass. Gen. Laws ch. 151B; **affirm** the grant of summary judgment on Sutherland's wrongful termination claim based on alleged violation of Massachusetts public policy; and **remand** to the district court for further proceedings consistent with this opinion. Costs shall be taxed in favor of Sutherland.